IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ROBERT OGLESBY, | ) | |
| | ) | |
| Plaintiff, | ) | 4:16CV3189 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM** |
| AMY LESAN and CHAD HEIN, | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff brings this 42 U.S.C. § 1983 action under the Fourth Amendment alleging that Lancaster County Sheriff's Deputy Amy Lesan and City of Lincoln Police Officer Chad Hein, in their individual capacities only, used excessive force in unreasonably seizing and arresting him on January 28, 2013. (Filing No. 66, Amended Complaint ¶¶ 2-3.) Lesan and Hein have both moved for summary judgment based on qualified immunity, the merits, and *Heck v. Humphrey*, 512 U.S. 477 (1994). (Filing No. 101; Filing No. 104.)

**STANDARD OF REVIEW**

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 949 (8th Cir. 2012). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652-53 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate allegations with "'sufficient probative evidence [that] would permit

a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles Cnty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* Essentially, the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

A party opposing summary judgment "may not rest upon the mere allegation or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial, and must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quoting *Anderson*, 477 U.S. at 256-57 (quotation marks omitted)); *see also* *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-60 (1970).

## UNDISPUTED MATERIAL FACTS

In response to the Defendants' Motions for Summary Judgment, Plaintiff's counsel has filed a 111-page single-spaced brief (Filing No. 113) in which he spends 34 pages objecting to nearly every paragraph of the six affidavits[1] submitted in support of Defendants' motions, mainly for being "not in a form that could be admitted at trial" due to irrelevance and because Defendant Hein seized and arrested Plaintiff outside the city limits and, therefore, acted "without any lawful authority." The next 64 pages of counsel's brief objects—in tabular form—to all but three of the Defendants' stated material facts. Counsel begins his "argument" on page 98, again focusing on Officer Hein's lack of authority to act because he seized Plaintiff "well outside the city limits of the City of Lincoln, Nebraska." (Filing No. 113 at CM/ECF p. 100.)

---

[1] Filing No. 102, Exhibits 1-4 & 10-11.

2

As an initial matter, all of Plaintiff's relevance objections to the affidavits submitted in support of Defendants' Motions for Summary Judgment are overruled because each paragraph contained in such affidavits either constitutes background information that is "universally offered and admitted as an aid to understanding" or contains "ultimate, intermediate, or evidentiary" facts that are "of consequence in the determination of the action." Fed. R. Evid. 401 (Advisory Committee Notes) (Westlaw 2018). Further, Plaintiff's recurring objection that much of Defendants' evidence must be excluded because Officer Hein seized and arrested Plaintiff outside the city limits is overruled because the constitutional question raised by Plaintiff's § 1983 action is whether the Defendants' alleged seizure and arrest of Plaintiff violated the Fourth Amendment[2], not whether Hein's actions violated state law, a city ordinance, or a jurisdictional agreement between the City of Lincoln Police Department and the Lancaster County Sheriff's Office.

The court finds that the following material facts, as stated in the Defendants' briefs and construed in the light most favorable to Plaintiff, are fully supported by the evidence cited, are not subject to Plaintiff's evidentiary objections, and/or have not

---

[2]*Virginia v. Moore*, 553 U.S. 164, 176 (2008) (police did not violate Fourth Amendment when they made arrest based on probable cause, but the arrest was prohibited by state law; noting that "linking Fourth Amendment protections to state law would cause them to vary from place to place and from time to time" and concluding that "warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections" (internal quotation and citation omitted)); *Marksmeier v. Davie*, 622 F.3d 896, 901 (8th Cir. 2010) (court need not decide whether police officer was acting outside his primary jurisdiction under state law "because even if the arrest violated Nebraska law, it did not violate the Fourth Amendment"); *Rose v. City of Mulberry*, 533 F.3d 678, 679-80 (8th Cir. 2008) ("the determinative issue is whether an arrest by a city police officer outside of his jurisdiction but made with probable cause violates the Fourth Amendment as a matter of law"; "a police officer who makes an arrest that is based on probable cause but who is prohibited by state law from doing so does not violate the Fourth Amendment").

been properly controverted by Plaintiff.

1.      Plaintiff Robert Oglesby is a resident of Lancaster County, Nebraska, and was residing at 3807 S.W. 16th Street, Lancaster County, Nebraska 68522 on January 28, 2013, the date of the incident giving rise to this case. (Filing No. 66 at CM/ECF p. 1 ¶ 1; Filing No. 1 at CM/ECF p. 2 ¶ 6.)

2.      The City of Lincoln is a political subdivision, primary class city, and municipal corporation of the State of Nebraska that provides law enforcement through police officers employed at the Lincoln Police Department ("LPD"). (Filing No. 66 at CM/ECF p. 1 ¶ 3; Filing No. 102-10 at CM/ECF p. 1.)

3.      Defendant Chad Hein is a police officer with the LPD. (Filing No. 66 at CM/ECF p. 1 ¶ 3; Filing No. 102-2 at CM/ECF p. 1 ¶ 3; Filing No. 68 at CM/ECF p. 1 ¶ 3.)

4.      Defendant Amy Lesan is a sheriff's deputy with the Lancaster County Sheriff's Office ("LSO"). (Filing No. 66 at CM/ECF p. 1 ¶ 2; Filing No. 102-3 at CM/ECF p. 1 ¶ 3; Filing No. 73 at CM/ECF p. 2 ¶ 2.)

5.      On January 28, 2013, at about 10:56 p.m., Deputy Lesan was on duty with the LSO when she was dispatched to the intersection of Hickman Road and South 68th in Hickman, Nebraska, based on a report of a suspicious female who had been standing around with some personal property for about 45 minutes. The female turned out to be Nina Salazar. (Filing No. 102-3 at CM/ECF p. 1 ¶¶ 4-6.)

6.      Salazar informed Deputy Lesan that she was waiting for a ride, and shortly thereafter Plaintiff pulled up to pick up Salazar. (Filing No. 102-3 at CM/ECF p. 2 ¶¶ 7-9.) Plaintiff claims that Lesan was not present when he arrived to pick up Salazar. (Filing No. 112-2 ¶¶ 6-8.) In any event, it is undisputed that Plaintiff picked up Salazar and her luggage from Hickman.

7.      Deputy Lesan recognized Plaintiff from his past extensive contacts with the LSO. Plaintiff's name had come up frequently during "lineup" (daily briefings) due to his contacts with the LSO, and Lesan had received information that Plaintiff had threatened to kill law enforcement the month before and was known to have access to weapons. (Filing No. 102-3 at CM/ECF p. 2 ¶¶ 9, 14; Filing No. 112-4 at CM/ECF pp. 16, 35.) Plaintiff denies that he made such a threat and that he had access to weapons on the relevant date.[3] (Filing No. 112-2 at CM/ECF ¶¶ 19, 21.)

8.      According to Plaintiff, Lesan asked him to produce his driver's license, vehicle registration, and proof of registration, which he did. Lesan then directed Plaintiff to stay put while she "ran" his information. (Filing No. 112-2 ¶¶ 11-13.)

9.      Deputy Lesan "ran" Plaintiff's name from her LSO vehicle and found that Plaintiff was the subject of a LPD "broadcast." A "broadcast" refers to the situation in which "a person in law enforcement . . . wants to contact and speak with a person but they've been unable to locate them." The broadcast regarding Plaintiff indicated he should be cited for an offense, which indicated to Lesan that "there's probable cause to arrest." (Filing No. 102-3 at CM/ECF p. 2 ¶ 10; Filing No. 112-4 at CM/ECF pp. 22-27.) Lesan did not arrest Plaintiff at that time because she feared for her safety and because protocol dictated that the entity issuing the

_____

[3]Plaintiff's claim that he did not threaten anyone or have access to weapons does not negate what Deputy Lesan believed to be true based on information she learned about Plaintiff in the course of her duties with the Lancaster County Sheriff's Office. The same is true for what Officer Hein believed to be true based on information he learned in the course of his duties with the Lincoln Police Department. The information Lesan and Hein learned about Plaintiff from the LPD database (*see, e.g.*, Filing No. 102-2 at CM/ECF p. 29) is not inadmissible hearsay because it is not considered for its truth, but to show its effect on the hearer.  Even if the information was hearsay, "officials may rely on hearsay statements to determine that probable cause exists." *Carpenter v. Gage*, 686 F.3d 644, 649 (8th Cir. 2012).

broadcast—here, the LPD—"will take care of it." (Filing No. 112-4 at CM/ECF pp. 27-29.)

10.     Deputy Lesan then returned Plaintiff's documents to him and informed him that the LPD had a bulletin or broadcast for him. Lesan perceived that Plaintiff became instantly angry and aggressive, insisting there was no such broadcast. Lesan claims that Plaintiff changed his posture in response to this information and appeared to be getting ready to fight. Plaintiff denies that he became angry or aggressive, that he changed his posture, and that he was preparing to fight.[4] (Filing No. 102-3 at CM/ECF p. 2 ¶¶ 11-12; Filing No. 102-5 at CM/ECF pp. 1-2, RFA No. 4; Filing No. 112-2 ¶¶ 12-14.) Plaintiff asked whether he was under arrest, and Deputy Lesan told him he was not. (Filing No. 112-2 ¶ 14.)

11.     Plaintiff told Deputy Lesan that if the LPD wanted to speak to him, they could call him. Lesan twice questioned Plaintiff about where he was heading, and Plaintiff twice told her "it was none of her business." After confirming with Lesan that he could leave the scene, Plaintiff told Lesan he was going home, and Lesan stated that she would follow him. Lesan thought Plaintiff might be more cooperative at his residence and there would be more law enforcement in the area if she needed to call for assistance. (Filing No. 102-3 at CM/ECF p. 2 ¶ 14.) Plaintiff denies that he was being uncooperative.[5] (Filing No. 112-2 ¶ 14.)

12.     While following Plaintiff's vehicle to his residence at 3807 S.W. 16th Street, Lancaster County, Nebraska 68522, Deputy Lesan called dispatch to ensure a LPD officer was sent there. (Filing No. 102-3 at CM/ECF p. 3 ¶¶ 16-17; Filing No. 102-2 at CM/ECF p. 1 ¶ 4; Filing No. 102-5 at CM/ECF p. 2, RFA No. 7.)

---

[4]Plaintiff's testimony that he was not angry, did not change his posture, and was not preparing to fight does not create a dispute of fact regarding what Deputy Lesan perceived to be true by observing Plaintiff's demeanor.

[5]*See* n.4.

13.     At about 11:34 p.m., LPD Officer Hein was dispatched to meet Deputy Lesan at the residence to take care of the LPD broadcast. (Filing No. 102-2 at CM/ECF pp. 1-2 ¶¶ 4, 6.)

14.     Officer Hein was informed by dispatch that the individual to be cited was Plaintiff Robert Oglesby. Officer Hein had not met Plaintiff, but he was familiar with the name due to numerous dangerous-person bulletins and alerts during LPD lineup. These bulletins and alerts led Officer Hein to believe that Plaintiff was a dangerous person with several weapons at his disposal who had made comments about being violent toward law enforcement and his own family. Hein was also aware of bulletins that dealt with Plaintiff having protection orders issued against him by his ex-wife or ex-girlfriend. (Filing No. 102-2 at CM/ECF pp. 2-3 ¶¶ 7-8, 12.) Plaintiff denies being dangerous, having weapons at his disposal, and making comments about being violent to law enforcement or his family.[6] (Filing No. 112-2 at CM/ECF ¶¶ 19-22.)

15.     From his mobile data terminal in his LPD cruiser, Officer Hein ran Plaintiff's name through the LPD database and found a "very strong" caution indicator for Plaintiff that had been issued on December 11, 2012—a little over a month before the incident at issue—stating that Plaintiff was the subject of an open threat-assessment case, with Plaintiff being classified as "Dangerous." It also stated, "Large amount of weapons in home. States if SWAT is called out, he would take out several SWAT members in the process." (Filing No. 102-2 at CM/ECF pp. 2-3 ¶¶ 9 & 11, p. 29 & Ex. D, p. 15 & Ex. A, ACI No.3.) Plaintiff denies that he is dangerous, had any weapons in his home on January 28, 2013, and that he threatened to "take out" SWAT members.[7] (Filing No. 112-2 ¶¶ 19-22.)

16.     Through the LPD database, Officer Hein learned that the "broadcast" for

---

[6]*See* n.3.

[7]*See* n.3.

7

which Plaintiff was to be cited related to a disturbance that had occurred in Lincoln, Nebraska. The reports indicated that Plaintiff had threatened his ex-girlfriend's new boyfriend, stating that the next time they met, the new boyfriend would be eating through wires for months. Plaintiff then allegedly made a motion to his jaw with his finger. The boyfriend called the LPD and stated he was fearful for his life. The threatening nature of the conversation was verified by an independent witness. (Filing No. 102-2 at CM/ECF p. 2 ¶ 9 & pp. 12-13, Ex. A; Filing No. 102-4 at CM/ECF pp. 3-4, Ex. A.) Plaintiff denies that he has ever acted in a threatening manner toward any of his ex-girlfriend's boyfriends.[8] (Filing No. 112-2 ¶ 20.)

17.  From these reports, Officer Hein determined he had sufficient probable cause to issue a citation to Plaintiff for the disturbance that had occurred in Lincoln. (Filing No. 102-2 at CM/ECF p. 2 ¶ 10.)

18.  Officer Hein believed he had authority to issue a citation to Plaintiff in Lancaster County outside the geographical limits of the City of Lincoln through mutual aid agreements between the LPD and LSO and Neb. Rev. Stat. §§ 15-326 and 29-215. (Filing No. 102-10 at CM/ECF p. 2; Filing No. 102-2 at CM/ECF p. 3 ¶ 16.)

19.  Officer Hein arrived at the residence before Deputy Lesan and Plaintiff, parking his LPD cruiser on the west side of Southwest 16th Street. There were "multiple" LPD vehicles also parked near Plaintiff's residence. (Filing No. 112-2 ¶ 17.) Officer Hein had been able to prepare the complete citation prior to Plaintiff's arrival at the residence, including the court dates and case number. (Filing No. 102-2 at CM/ECF p. 3 ¶¶ 14-15; Filing No. 102-3 at CM/ECF p. 3 ¶ 20.)

20.  A few minutes later, Plaintiff arrived and pulled his car up the driveway next to the residence. Officer Hein originally thought Plaintiff was being transported by Deputy Lesan, but when Officer Hein saw Plaintiff exit his vehicle not in custody,

---

[8]*See* n.3.

he became concerned due to reports of Plaintiff's alleged statements that he wanted to harm law enforcement officers and had weapons in the residence. (Filing No. 102-2 at CM/ECF pp. 3-4 ¶¶ 17-24; Filing No. 102-3 at CM/ECF p. 3 ¶¶ 21-22.)

21.     Plaintiff exited his vehicle, hopped a fence that was between the driveway and the back door, and started quickly walking toward the back door of the residence, wanting to get inside the house as soon as possible in order to avoid any confrontation. (Filing No. 112-2 ¶ 18.)

22.     Meanwhile, Officer Hein started walking up the driveway to speak with Plaintiff, repeatedly ordering Plaintiff to stop moving and to come where Hein was standing to talk with him. Plaintiff asked Hein if he had a warrant, to which Hein replied that he did not need one. Plaintiff claims that Officer Hein did not initially identify himself or his purpose in speaking with Plaintiff, although Hein claims he asked Plaintiff to stop and talk so he could take care of the LPD broadcast and citation. Officer Hein claims he raised up his ticket book and waved it at Plaintiff. (Filing No. 102-2 at CM/ECF pp. 4-5 ¶¶ 25-28; Filing No. 102-3 at CM/ECF p. 3 ¶¶ 22-25; Filing No. 112-2 ¶ 18.)

23.     Plaintiff told Officer Hein that he was outside his jurisdiction and was trespassing. Plaintiff claims it was at this point that Hein "said something about a citation or ticket and ask[ed] the plaintiff to sign it," but he did not have anything in his hands for Plaintiff to sign. In response to Plaintiff's inquiry, Officer Hein told Plaintiff he was not under arrest. Plaintiff claims that Hein would not tell him what the citation was for—Hein "just asked [the plaintiff] to come to where he was and sign it and . . . he would then be on his way." (Filing No. 112-2 ¶ 18.)

24.     Plaintiff refused Officer Hein's repeated requests to sign the citation, stating he would not do so until Hein told him "what this was all about." Hein eventually told Plaintiff the citation was related to an incident at the filling station by the "501" bar. Plaintiff continued to refuse to sign the citation, reminding Hein that

if he was a LPD officer, he was outside his jurisdiction. (Filing No. 112-2 ¶ 18.)

25.     Officer Hein perceived Plaintiff to become very agitated and irate as he continually refused Hein's requests to sign the citation. (Filing No. 102-2 at CM/ECF p. 5 ¶¶ 29, 33-34; Filing No. 102-3 at CM/ECF p. 3 ¶¶ 24, 26.) Plaintiff claims that he was not agitated or irate, did not threaten Hein, and did not direct profanity at him.[9] (Filing No. 112-2 ¶ 18.)

26.     Plaintiff then turned away from Officer Hein and began running or quickly walking toward the residence. (Filing No. 102-2 at CM/ECF pp. 5-6 ¶ 34; Filing No. 102-3 at CM/ECF p. 3 ¶ 24.) The parties dispute what prompted Plaintiff to run toward the residence. Officer Hein claims that Plaintiff began moving toward the residence after Hein informed Plaintiff that if he did not want to sign the citation, he would be arrested. (Filing No. 102-2 at CM/ECF pp. 5-6 ¶ 34; Filing No. 102-3 at CM/ECF p. 3 ¶ 24.) Plaintiff claims that Hein did not threaten to arrest him, but instead "abruptly reached to his side and pulled out what appeared to me to be a handgun, pointed it at me, and told me to come to him on the other side of the fence. . . . Before I had a chance to say anything else, he fired his weapon at me, which turned out to be a Taser in 'probe mode,' striking me in the upper right chest with two electrodes." (Filing No. 112-2 ¶ 18.)

In Plaintiff's deposition, he admitted he "thought it was better to go towards [his] house rather than listen to the officer's commands." (Filing No. 117-4 at CM/ECF p. 33.) Due to Plaintiff's failure to comply and stop, Officer Hein followed closely behind Plaintiff onto the porch of the residence and got on his radio to ask for assistance. (Filing No. 102-2 at CM/ECF p. 6 ¶¶ 36-37; Filing No. 102-3 at CM/ECF p. 4 ¶¶ 30-31.)

27.     Both Officer Hein and Deputy Lesan were concerned for their safety if

---

[9] *See* n.4.

Plaintiff entered the residence and barricaded himself inside with his alleged weapons, especially given the LPD-issued caution about Plaintiff threatening to "take out" SWAT members, the alleged existence of weapons in his residence, and his alleged hatred for law enforcement.[10] (Filing No. 102-2 at CM/ECF pp. 2-4 ¶¶ 7, 11, 23, 24; Filing No. 102-3 at CM/ECF p. 4 ¶ 29.)

28.     Sometime during the activities occurring in the yard of Plaintiff's residence, Plaintiff's mother had come to the door of the residence from inside. She allowed Plaintiff to step inside behind her into the residence, and then she began arguing with Officer Hein and interfering with the situation, despite Officer Hein's repeated directions to stop. (Filing No. 102-2 at CM/ECF pp. 6-7 ¶¶ 38-39, 43; Filing No. 102-3 at CM/ECF p. 4 ¶ 33.)

29.     Deputy Lesan circled around the residence in case Plaintiff escaped from the back. When she heard Plaintiff yelling at the front door of the residence, she came back to the porch of the residence behind Officer Hein as he was trying to deescalate the situation with Plaintiff. (Filing No. 102-3 at CM/ECF p. 4 ¶¶ 30-32.)

30.     Officer Hein saw Plaintiff in the residence behind his mother. At times, Plaintiff would offer to sign the citation that was in Officer Hein's hand, but when Officer Hein would ask him to step outside to do so, he would appear to become agitated and say no one could enter the residence and then would not step outside or cooperate. (Filing No.102-2 at CM/ECF pp. 6-7 ¶¶ 40-41; Filing No. 102-3 at CM/ECF p. 4 ¶ 32.)

31.     Plaintiff and Defendants have different versions of what occurred from this point. The Defendants describe the next events as follows:

Plaintiff started to close the door on his mother as she was still partially in the

---

[10]*See* n.3.

doorway, which led Officer Hein to place his foot in the doorway to stop the door from closing completely in order to prevent any injury to her. Plaintiff was able to pull his mother into the residence and place his full body weight on the door to try to force it closed even though Officer Hein's foot was physically stuck between the door and the door frame. Officer Hein asked for Plaintiff to let him go, but Plaintiff refused and continued to press on the door for 10 to 15 seconds, causing Officer Hein pain and injury from the pressure.

Due to Plaintiff refusing to cooperate to release Officer Hein's leg from the door, Officer Hein displayed his Taser and then deployed it when Plaintiff continued to scream at him. The Taser did not seem to have much effect on Plaintiff due to a dense, heavy winter coat he was wearing, although Plaintiff did stumble back into the residence which released Officer's Hein's leg from the door.

Plaintiff ran into the residence, which was not well-lit, and Officer Hein followed to prevent Plaintiff from accessing any weapons, to arrest Plaintiff for failure to comply, and to ensure that Plaintiff was not injured by the Taser. Officer Hein was concerned Plaintiff could be going for the firearms or other weapons believed to be in the residence due to the LPD-issued caution and dangerous-person bulletins on Plaintiff. Officer Hein believed that if Plaintiff were allowed to go further into the residence out of the officers' sight, he would likely obtain a firearm and cause harm to them.

Officer Hein was able to grab or tackle Plaintiff to the ground to prevent him from leaving his presence. Despite being on the ground, Plaintiff continued to resist Officer Hein and fight against him, including kicking and flailing his arms, even while Officer Hein was giving him commands to stop resisting. At that point, Officer Hein believed he was all alone with Plaintiff in the residence, trying to gain control of him with no assistance.

At some point, Deputy Lesan entered the residence. Once she entered, she made

sure Plaintiff's mother was not a threat and that there were no weapons readily available. She requested assistance on the radio as she and Officer Hein were struggling with Plaintiff. Deputy Lesan was able to handcuff Plaintiff's right wrist, but could not force his wrist behind him to complete handcuffing him; Plaintiff was still on his back resisting orders, trying to stand up, and failing to follow orders to roll over to be handcuffed. Plaintiff finally stopped fighting, and Officer Hein and Deputy Lesan finished handcuffing him.

After being handcuffed, Plaintiff did not complain of any injuries to Officer Hein or Deputy Lesan. Several LPD officers and LSO deputies who responded to the radio calls for assistance at the residence booked Plaintiff into the Lancaster County jail. Officer Hein suffered injuries and pain from his struggle with Plaintiff to place him under arrest and was treated at Bryan Medical Center that night.

(Filing No. 102-2 at CM/ECF pp. 7-11 ¶¶ 44, 46-71 & Ex. B; Filing No. 102-3 at CM/ECF pp. 4-7 ¶¶ 34-50 & Ex. A; Filing No. 66 at CM/ECF p. 5 ¶ 6; Filing No. 68 at CM/ECF p. 3 ¶ 6.)

32.    The Plaintiff describes the events in this way:

Before my mother got the backdoor completely closed, Hein got over the fence, ran through the back yard, rushed the backdoor, shoved my mother out of the entryway, knocking her to the floor, then ran through the kitchen and into the living room and tackled me. I landed on my back, with my head and neck pushed up against the bottom of the living room sofa. He used his knee to kick me in my jaw, which knocked a gold crown from one of my teeth. Then, while still on the top of me, Hein stunned me multiple times in the neck and ribs with either the same or a different Taser that he had. I was on my back, out of breath, and motionless, and Hein had all of his weight on top of me. My mother was screaming.

Right then, Lesan came inside the house. I had not seen her when

I was in the yard talking to Hein. The last I knew she was inside her vehicle following me as I turned the comer from Burnham to SW 16th Street. Both me and my mother pleaded with Hein to get off of me. I could not breathe. Lesan then got on the floor to my right and started jerking my right arm. She was apparently trying to put a handcuff on my right wrist. She pulled so hard that I felt my right shoulder "pop." I believed that she had pulled out my right shoulder from the shoulder socket, causing me even more pain. Hein then got off of me, and somehow Lesan got both handcuffs on my wrists. She placed the handcuffs on me extremely tight. Hein and Lesan then lifted me up, but did so with such force that I felt my right shoulder "pop" again. This caused me even more pain.

I could barely stand, but Hein and Lesan walked me out of the house and placed me in the back of a law enforcement vehicle, but I have no idea whose vehicle it was. An emergency vehicle belonging to the all-volunteer rural "Southwest Fire Department" was already at my residence when I was walked out of my residence and placed into the law enforcement vehicle, which I thought was strange. It suggested to me that there had been a plan to injure me. I was having serious difficulty breathing and was in severe pain.

. . . .

I was eventually driven to the emergency room at Bryan "West" Hospital in Lincoln, Nebraska, where I was examined and treated. I was then transported to the Lancaster County, Nebraska jail.

(Filing No. 112-2 (paragraph numbers omitted and spacing adjusted).) Plaintiff also generally proclaims that:

I have never threatened any law enforcement officer with harm, and I have never had hatred for law enforcement. I do not believe that I am dangerous or violent, and I do not believe that I have ever been dangerous or violent. I do not believe that I have ever made comments about being violent to anybody. I have never threatened the boyfriend of any ex-girlfriend of mine. Although I have possessed a weapon in my

life, I did not possess or have access to any weapons on January 28, 2013, and no weapons were at my disposal on January 28, 2013. I have never had a tendency to fight.

(Filing No. 112-2 ¶¶ 19-22 (paragraph numbers omitted).)

Plaintiff claims he was "being perfectly compliant with everything" during the "tussling type deal" with the officers in his home and that he "didn't try to use no force on them." (Filing No. 117-4 at CM/ECF pp. 34-35, 39.) However, he admits that the officers "might have thought" that Plaintiff was "trying to fight them." (Filing No. 117-4 at CM/ECF p. 36 ("Q. Do you think it appeared to them that you were trying to fight them? A. They might have thought that . . . .)).

33.    On January 30, 2013, Plaintiff was charged with violations of Lincoln Municipal Code ("L.M.C.") § 9.08.050 "refuse to comply with order of police" and L.M.C. § 9.08.030 "hinder, delay, or interrupt arrest" in the case of *State v. Robert Oglesby* in the County Court of Lancaster County, Case No. CR-13-1841, arising out of the incident on January 28, 2013.  On May 15, 2013, Plaintiff pled no contest to the charge of violating L.M.C. § 9.08.030 to "hinder, delay, or interrupt arrest" in the criminal case arising out of the incident on January 28, 2013. (Filing No. 102-4 at CM/ECF p. 11, Ex. B; Filing No. 102-5 at CM/ECF p. 5, RFA Nos. 23, 25; Filing No. 102-6 at CM/ECF pp. 2-7.)

34.    On October 25, 2013, due to Plaintiff's no-contest plea, Plaintiff was ordered to pay a fine of $500.00 and to stand committed to the Lancaster County Correction Facility until the fines and costs were paid in Case No. CR-13-1841. (Filing No. 102-6 at CM/ECF pp. 11-12; Filing No. 102-5 at CM/ECF p. 5, RFA Nos. 26-27; Filing No. 68 at CM/ECF p. 3 ¶ 6.)

35.    Plaintiff's conviction and sentence by the County Court of Lancaster County in Case No. CR-13-1841 was not appealed to the Nebraska Court of Appeals

or the Nebraska Supreme Court, and his conviction was not expunged or declared invalid. (Filing No. 102-8; Filing No. 102-5 at CM/ECF p. 6, RFA No. 26; Filing No. 68 at CM/ECF p. 4 ¶ 17.)

## DISCUSSION

Plaintiff claims that (1) Deputy Lesan violated the Fourth Amendment by unreasonably seizing him in Hickman, Nebraska, and (2) Deputy Lesan and Officer Hein violated the Fourth Amendment by unreasonably seizing or arresting him at his residence and in using excessive force to do so. (Filing No. 66 at CM/ECF pp. 5-6.)

## A.  The Alleged Hickman "Seizure"

Deputy Lesan's contact with Plaintiff in Hickman, Nebraska, did not constitute a "seizure" within the meaning of the Fourth Amendment. "[M]ere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search . . . provided they do not induce cooperation by coercive means. If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." *United States v. Villa-Gonzalez*, 623 F.3d 526, 531 (8th Cir. 2010) (internal quotation and citation omitted). Factors a court should consider in determining whether a person would feel free to terminate an encounter with police include "officers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation." *Villa-Gonzalez*, 623 F.3d at 532-33 (internal quotation and citations omitted).

Here, there is no evidence that Deputy Lesan made a show of authority other

than driving a marked Sheriff's cruiser when pulling up to Plaintiff. There is no evidence that Deputy Lesan activated her overhead lights, displayed a weapon, blocked in Plaintiff's vehicle, or physically touched or threatened Plaintiff. Plaintiff acknowledges that Lesan expressly told him he was not under arrest and he was free to go, but that he had a broadcast for him out of Lincoln. It is evident that Plaintiff knew he could terminate the encounter because he did just that—after loading Salazar's belongings into his car, he left the area and returned to his residence.

Therefore, Deputy Lesan did not "seize" Plaintiff within the meaning of the Fourth Amendment during their encounter in Hickman, Nebraska, and Lesan's Motion for Summary Judgment on this claim must be granted on the merits.

## B. The Seizure/Arrest at Plaintiff's Residence

Plaintiff's only argument with regard to Officer Hein is that he violated the Fourth Amendment because he seized and arrested Plaintiff outside the city limits and, therefore, outside his jurisdiction. (Filing No. 113 at CM/ECF pp. 100-107.) I am not persuaded by this argument because, as stated above, the question for Fourth Amendment purposes is the constitutional reasonableness of the alleged seizures and arrest, not whether Officer Hein was acting within the proper geographical area pursuant to state law or government agreement.[11] *Virginia v. Moore*, 553 U.S. 164, 176 (2008)

_____

[11] I am also not persuaded by Defendant Hein's argument that he had jurisdiction to seize and arrest Plaintiff outside the city limits of Lincoln, Nebraska, because of an interlocal agreement between the Lincoln Police Department and the Lincoln Sheriff's Office. (Filing No. 102-10, Aff. Thomas K. Casady ("LPD and LSO have operated under these mutual aid agreements for approximately twenty (20) years.") *See also* Neb. Rev. Stat. § 15-326 (Westlaw 2018) (jurisdiction of city police officers "in the service of process, in all criminal cases, and in cases for the violation of city ordinances shall be coextensive with the county"); Neb. Rev. Stat. § 29-215 (Westlaw 2018) (law enforcement officers acting beyond their primary jurisdiction may nevertheless enforce state law and city ordinances, including arresting and detaining suspects, when municipality and county have contract under Interlocal Cooperation

(police did not violate Fourth Amendment when they made arrest based on probable cause, but the arrest was prohibited by state law); *Marksmeier v. Davie*, 622 F.3d 896, 901 (8th Cir. 2010) (court need not decide whether police officer was acting outside his primary jurisdiction under state law "because even if the arrest violated Nebraska law, it did not violate the Fourth Amendment") *Rose v. City of Mulberry*, 533 F.3d 678, 679-80 (8th Cir. 2008) ("the determinative issue is whether an arrest by a city police officer outside of his jurisdiction but made with probable cause violates the Fourth Amendment as a matter of law"; "a police officer who makes an arrest that is based on probable cause but who is prohibited by state law from doing so does not violate the Fourth Amendment").

Plaintiff admits that, while he was in his yard, he repeatedly refused to go near Officer Hein to sign the citation despite the officer's many orders to do so; Plaintiff told Hein more than once that Hein was acting outside of his jurisdiction, would need a warrant to enter his property, was trespassing, and needed to leave; and that Plaintiff ran or rapidly walked away from Officer Hein and entered his house without following Hein's orders, thinking "it was better to go towards [his] house rather than listen to the officer's commands." (Filing No. 117-4 at CM/ECF p. 33.)

Having observed these actions, Defendants witnessed Plaintiff committing the crime of "intentionally or knowingly refus[ing] to comply with an order of a police

---

Act or Joint Public Agency Act to allow such enforcement). The alleged agreement has not been filed as evidence in this case, making it impossible to determine whether such agreement expressly granted Hein enforcement authority outside the city limits. *See State v. Ohlrich*, 817 N.W.2d 797, 804 (Neb. Ct. App. 2012) ("the mere existence of an interlocal agreement does not necessarily mean that such agreement confers authority for any and all actions by a law enforcement officer operating outside his or her primary jurisdiction"—rather, the contents of the agreement must be known; holding that district court erred in finding that arrest was authorized by interlocal agreement when "the State failed to adduce evidence to establish that").

officer made in the performance of official duties at the scene of an arrest . . . or investigation," in violation of Lincoln Municipal Code § 9.08.050.[12] (Filing No. 102-9.) This provided probable cause for Plaintiff's eventual arrest. *District of Columbia v. Wesby*, 138 S. Ct. 577, 585 n.2 (2018) ("an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking"); *Moore*, 553 U.S. at 171, 178 ("When officers have probable cause to believe that a person has committed a crime in their presence, the Fourth Amendment permits them to make an arrest."; "In a long line of cases, we have said that when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt. The arrest is constitutionally reasonable."); *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1059 (8th Cir. 2013) ("Probable cause to make a warrantless arrest exists when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." (internal quotation marks omitted)); *Greiner v. City of Champlin*, 27 F.3d 1346, 1353 (8th Cir. 1994) (house guests' refusal to disperse from outdoor party at police officers' requests gave officers arguable probable cause to arrest homeowners for resisting dispersal order). Because Officer Hein and Deputy Lesan had probable cause to arrest Plaintiff, they did not violate the Fourth Amendment, and Defendants' Motion for Summary Judgment on the merits as to Plaintiff's arrest claim must be granted.

Because my decision that the officers had probable cause to arrest Plaintiff after they witnessed him commit a misdemeanor in their presence is sufficient to resolve this claim, I shall not address the issue of qualified immunity. *Wesby*, 138 S. Ct. at 589 & n.7 ("We continue to stress that lower courts 'should think hard, and then think hard again,' before addressing both qualified immunity and the merits of an underlying constitutional claim." (quoting *Camreta v. Greene*, 563 U.S. 692, 707 (2011)).

---

[12]This offense is a misdemeanor punishable by imprisonment in the county jail for up to six months or by a fine up to $500.00. Lincoln Municipal Code § 1.24.010(a).

## C. Excessive Force During Seizure/Arrest at Plaintiff's Residence

"[T]he right to be free from excessive force in the context of an arrest has been clearly established for some time." *Wilson v. Spain*, 209 F.3d 713, 716 n. 3 (8th Cir. 2000). "Not every push or shove violates the Fourth Amendment, but force is excessive when the officers' actions are not objectively reasonable in light of the facts and circumstances confronting them." *Royster v. Nichols*, 698 F.3d 681, 691 (8th Cir. 2012) (internal quotation and citation omitted). "Determining whether the force used was objectively unreasonable requires balancing of the individual's Fourth Amendment interests against the relevant government interests." *Hosea v. City of St. Paul*, 867 F.3d 949, 957 (8th Cir. 2017) (internal quotation and citation omitted). "'The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).

Careful attention must be paid "to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The court should "'allo[w] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Id.* (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014)). "[I]t is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009).

Plaintiff has submitted deposition testimony that Officer Hein used a "stun gun" on him just as Plaintiff was ready to enter the residence, tackled Plaintiff once Plaintiff and Hein were inside the house, kneed Plaintiff in the jaw causing a crown to come

loose, used the stun gun on Plaintiff multiple times during the course of the arrest, and handcuffed him in such a way that Plaintiff's right shoulder popped in and out of its socket. Plaintiff claims that Deputy Lesan assisted with the painful handcuffing, and that shortly after the event, Plaintiff's blood pressure skyrocketed to 368/128. (Filing No. 117-4.)

Besides denying that he resisted arrest, Plaintiff's declaration broadly states:

> I have never threatened any law enforcement officer with harm, and I have never had hatred for law enforcement. I do not believe that I am dangerous or violent, and I do not believe that I have ever been dangerous or violent. I do not believe that I have ever made comments about being violent to anybody. I have never threatened the boyfriend of any ex-girlfriend of mine. Although I have possessed a weapon in my life, I did not possess or have access to any weapons on January 28, 2013, and no weapons were at my disposal on January 28, 2013. I have never had a tendency to fight.

(Filing No. 112-2 ¶¶ 19-22 (paragraph numbers omitted).) I shall not consider Plaintiff's sweeping and uncorroborated "beliefs" in his declaration. *de Llano v. Berglund*, 282 F.3d 1031, 1035 (8th Cir. 2002) (plaintiff's belief that defendants behaved vindictively, without evidence to support such assertion, "ha[s] no effect and do[es] not create a genuine issue of material fact that would preclude summary judgment" (internal quotation and citation omitted)); *Policky v. City of Seward*, Neb., 433 F. Supp. 2d 1013, 1016 n.2 (D. Neb. 2006) ("[M]ere statement[s] of belief do[] not create a genuine issue of material fact.")

Defendants' Motions for Summary Judgment assert that they are entitled to qualified immunity on Plaintiff's excessive-force claim. "Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Brown*, 574 F.3d at 495 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine the question of qualified immunity, the court

must apply a two-part inquiry: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Brown*, 574 F.3d at 496. Courts have discretion to decide which part of the inquiry to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

To determine whether an action was a "clearly established" constitutional violation, the court must "look to the state of the law at the time of the incident"—here, January 28, 2013—and analyze "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 896-97 (8th Cir. 2014) (internal quotation and citation omitted). "In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate. This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Wesby*, 138 S. Ct. at 589 (internal quotations and citations omitted).

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust consensus of cases of persuasive authority." It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that "every reasonable official" would know.

*Id.* at 589-590 (some internal quotation marks omitted; internal citations omitted).

Finally, to be "clearly established," the legal principle at issue must "clearly prohibit the officer's conduct in the particular circumstances before him." That is, "[t]he rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted. This requires a high degree of specificity." *Id.* at 590 (internal quotations and citations omitted). However,

the Supreme Court has "not yet decided what precedents—other than [their] own—qualify as controlling authority for purposes of qualified immunity," and has noted that its citation to lower court precedents is only for the purposes of determining "how a reasonable official could have interpreted them." *Id*. at 591 n.8 (internal quotation and citation omitted).

Even if the reasonableness of the officers' actions is questionable, Plaintiff "cannot defeat the officers' defense of qualified immunity unless [he is] able to show that a reasonable officer would have been on notice that the officers' conduct violated a clearly established right." *De Boise*, 760 F.3d at 896; *see also Meehan v. Thompson*, 763 F.3d 936, 940 (8th Cir. 2014) ("To overcome the defense of qualified immunity the plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." (internal quotation and citation omitted)).

Here, Plaintiff's only argument against the Defendants' assertion of qualified immunity is—once again—that Officer Hein did not have authority to engage in any of the conduct alleged at Plaintiff's residence because he was acting outside of his jurisdiction. (Filing No. 113 at CM/ECF pp. 107-108.) I have dispelled this argument above. Plaintiff does not discuss how the facts, construed in his favor, demonstrate a violation of his constitutional rights, nor whether such rights were clearly established on the date of the incident. Specifically, Plaintiff does not identify any previous case that clearly established the unconstitutionality of the officers' actions in January 2013. Nevertheless, and out of an abundance of caution, I shall fully address the qualified-immunity issue insofar as Plaintiff's excessive-force claim is concerned.

Despite Plaintiff's claim that he did not resist Officer Hein and Deputy Lesan as they attempted to arrest him, it remains undisputed that both officers believed—from "a very extensive history" and multiple reports regarding Plaintiff gained in the course of their law-enforcement duties—that Plaintiff was classified as

dangerous, had weapons, had threatened to kill SWAT team members, and had been the subject of numerous protection orders and a LPD broadcast for threatening to harm an individual. The events that occurred at Plaintiff's residence on January 28, 2013, did not disprove those beliefs.

Further, at the time Officer Hein and Deputy Lesan applied the alleged "excessive force," Plaintiff had twice refused to tell Lesan where he was going from Hickman, Nebraska, saying "it was none of her business"; ordered officers to leave his property because the officers were acting outside their jurisdiction; fled from the officers in the yard and quickly moved toward his house after repeatedly refusing to sign the citation; and admittedly engaged in a "tussling type deal" with officers in the house such that the officers "might have thought" that Plaintiff was "trying to fight them." (Filing No. 117-4 at CM/ECF p. 33-34 ("Q. So you thought it was better to go towards your house rather than listen to the officer's commands? A. Yes, ma'am."); Filing No. 117-4 at CM/ECF p. 36 ("Q. Do you think it appeared to them that you were trying to fight them? A. They might have thought that . . . .).)

For the reasons that follow, I conclude that in January 2013, existing binding precedent did not place it "beyond debate" that law-enforcement officers in these particular circumstances would violate the Fourth Amendment by applying the level of force alleged here—that is, a reasonable officer would not have understood that the actions taken here would constitute "excessive force."

● A reasonable officer acting in January 2013 could have reasonably believed Plaintiff was armed, dangerous, and a threat to everyone's safety at the scene, necessitating that officers promptly and efficiently subdue him, using whatever force was necessary to do so.

Specifically, in light of  the officers' knowledge that Plaintiff had been classified by a law-enforcement agency as dangerous because he possessed weapons, threatened to kill SWAT team members, and was the subject of numerous protection

orders and a LPD broadcast for threatening to harm an individual—combined with Plaintiff's defiant behavior in refusing to answer Lesan's questions, refusing to sign the citation, ordering law enforcement to leave his property, and "tussling" with the officers while they were attempting to arrest him—a reasonable officer could have believed Plaintiff was resisting arrest and was attempting to wrestle himself away from them in order to gain access to weapons to harm himself and others at the scene, thereby justifying the use of force necessary to effect the arrest. *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017) (officers at a 2010 arrest scene entitled to qualified immunity on excessive-force claim because they could have reasonably interpreted arrestee's behavior of continuing to lay on his hands and refusing to comply with instructions as resistance and reasonably respond by use of a Taser, regardless of whether arrestee intended to resist); *Loch v. City of Litchfield*, 689 F.3d 961, 966 (8th Cir. 2012) ("An act taken based upon a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment."); *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012) (affirming dismissal of excessive-force claim where plaintiff was Tasered after failing to produce hands for cuffing, despite plaintiff's assertion he moved his hands "merely as an effort to breathe"; "Even if [the arrestee's] motive was innocent, the deputies on the scene reasonably could have interpreted Carpenter's actions as resistance and responded with an amount of force that was reasonable to effect the arrest."); *Greiner*, 27 F.3d at 1355 (police officers entitled to qualified immunity when they used force against § 1983 plaintiffs who fled from yard party into house attempting to escape arrest and "concededly struggled with the police"). *See, e.g.*, *Hosea*, 867 F.3d at 959 (in April 2014, even if officers mistakenly believed that § 1983 plaintiff was resisting arrest, "the use of force was still objectively reasonable because a reasonable officer on the scene could have concluded that [the plaintiff] still posed a threat to [the officer's] safety. *Graham* specifically contemplates that officers may consider the suspect's potential to harm others when deciding whether to use force in effecting an arrest.")

- A reasonable officer acting in January 2013 would have known that handcuffing suspects behind the back is routine police procedure and would not be

considered excessive force unless the suspect had a severe and obvious medical injury. *Blazek v. City of Iowa City*, 761 F.3d 920, 925 (8th Cir. 2014) (officers were entitled to qualified immunity on excessive-force claim related to handcuffing maneuver because a reasonable officer acting in 2009 would know that "grabb[ing] plaintiff's arm, twist[ing] it around plaintiff's back, jerking it up high to the shoulder . . . was a relatively common and ordinarily accepted non-excessive way to detain an arrestee" (internal quotation and citation omitted)); *Royster*, 698 F.3d at 691 (handcuffing of arrestee's hands behind his back is routine police procedure, and decision to deviate from this standard practice is judgment call) (collecting cases). Even though handcuffing a suspect behind the back "in the face of a severe and obvious medical injury" may constitute excessive force, there is no evidence here that Officers Hein and Lesan knew that Plaintiff had prior shoulder issues or that such issues were visible. *Royster*, 698 F.3d at 691-692.

● The law in January 2013 was not sufficiently clear to put a reasonable officer on notice that using a Taser or stun gun under these circumstances would be considered excessive force within the meaning of the Fourth Amendment. At the time of the incident involved here, the Eighth Circuit Court of Appeals had clearly determined in *Brown*, 574 F.3d at 498, that "non-violent, non-fleeing subjects have a clearly established right to be free from the use of tasers." *See also Shekleton v. Eichenberger*, 677 F.3d 361, 366 (8th Cir. 2012) (as of 2008, the use of a Taser on an arrestee who was "an unarmed suspected misdemeanant, who did not resist arrest, did not threaten the officer, did not attempt to run from him, and did not behave aggressively towards him" was a violation of the Fourth Amendment). However, the Eighth Circuit Court of Appeals had "yet to determine whether a violent subject, acting aggressively toward officers, has a clearly established right to be free from multiple tasings." *De Boise*, 760 F.3d at 897 (2014 decision stating that court had yet to determine if violent, aggressive subject had clearly established right to be free from multiple tasings).

The undisputed facts here show that when Officer Hein allegedly used the stun

gun on Plaintiff, the officers had knowledge of Plaintiff's official law-enforcement record of violent threats and protection orders, his classification as dangerous, his supposed supply of weapons, his repeated refusal to comply with the officers' requests at the scene, and Plaintiff's physical behavior during the attempted arrest that officers "might have thought" that Plaintiff was "trying to fight them." (Filing No. 117-4 at CM/ECF p. 36.) Clearly, Plaintiff was not a "non-violent, non-fleeing" subject who had a clearly established right to be free from Taser use. Rather, a reasonable officer knowing what Officer Hein and Deputy Lesan knew on January 28, 2013, would have viewed Plaintiff as a violent subject who was acting defiantly toward officers—the type of subject against whom multiple Tasings had not been clearly prohibited at the relevant time. *Brown*, 574 F.3d 491, 499 & n.5 (stating that "[t]he Taser is a relatively new implement of force, and case law related to the Taser is developing"; citing *Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008) ("in a difficult, tense and uncertain situation the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force" (internal quotation and citation omitted))); *Carpenter*, 686 F.3d at 650 (affirming dismissal of excessive-force claim where plaintiff was Tasered after failing to produce hands for cuffing, despite plaintiff's assertion he moved his hands "merely as an effort to breathe"; "Even if [the arrestee's] motive was innocent, the deputies on the scene reasonably could have interpreted Carpenter's actions as resistance and responded with an amount of force that was reasonable to effect the arrest."); *McKenney v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2011) (not excessive force for officer to use single Taser shock on arrestee who suddenly lunged toward window, even though arrest warrants were based on minor offenses, arrestee did not threaten officers, officers had no reason to believe arrestee had weapon, and result of force was arrestee's death; "When [the arrestee] made a sudden movement toward the window, which the officers reasonably interpreted as an active attempt to evade arrest by flight, the officers were entitled to use force to prevent [the arrestee's] escape and effect the arrest. Although the charges were limited to misdemeanors, the officers executing the warrant were not required to let [the arrestee] run free."); *Clark v. Ware*, 873 F. Supp. 2d 1117, 1123 (E.D. Mo. 2012) (assuming officers' use of Taser on

arrestee was excessive use of force, officers were still entitled to qualified immunity because court could not determine as a matter of law that officer violated clearly established law as of November 2009 because "case law related to taser use is still developing") (collecting cases) (cited with approval in *De Boise*, 760 F.3d at 897); Bailey Jennifer Woolfstead, *Don't Tase Me Bro: A Lack of Jurisdictional Consensus Across Circuit Lines*, 29 T.M. Cooley L. Rev. 285, 303 (2012) (as of 2012, "there are no bright-line rules in the jurisprudence about Tasers in most circuits. More importantly, there is a circuit split as to what level of force Tasers constitute, when their use is appropriate, and when qualified immunity should be granted." (citing Taser cases from all circuits and noting lack of Supreme Court guidance)).

Accordingly, because a reasonable officer would not have been on notice in January 2013 that the amount of force used on Plaintiff was excessive under the Fourth Amendment, the Defendants are entitled to qualified immunity on Plaintiff's excessive-force claim.[13]

IT IS ORDERED:

1.     Defendant Chad Hein's Motion for Summary Judgment (Filing No. 101) is granted on the merits as to Plaintiff's unreasonable seizure/arrest claim and because Defendant Hein is entitled to qualified immunity on Plaintiff's excessive-force claim;

2.     Defendant Amy Lesan's Motion for Summary Judgment (Filing No. 104) is granted on the merits as to Plaintiff's unreasonable seizure/arrest claim and because Defendant Lesan is entitled to qualified immunity on Plaintiff's excessive-force claim;

3.     Plaintiff's Motion for Leave to File Sur-Reply (Filing No. 122) is

---

[13]Because I have resolved Defendants' Motions for Summary Judgment on other grounds, I need not address Defendants' *Heck v. Humphrey*, 512 U.S. 477 (1994), argument.

granted, and the evidentiary objections presented therein are denied; and

4.      Final judgment shall be entered by separate document.

DATED this 19th day of March, 2018.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge